UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 5:21-cr-64-JA-PRL

VICTOR BERMUDEZ-RUIZ

_____/

**REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

Mr. Bermudez-Ruiz moved to dismiss the indictment, arguing that the statute under which he is charged, 8 U.S.C. § 1326, is unconstitutional because it was enacted with a purpose of discriminating against Mexicans and other Latinos, and has had such an effect. The Government responded, making three arguments that will be addressed by this reply. First, the Government argues that courts always review "immigration laws" and "immigration-related challenges" only for a rational basis, and that § 1326 has such a rational basis. But when a challenger alleges that a government action was motivated by racial animus, the framework from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), applies, even in "immigration-related" contexts. The nature of the claim controls, not whether the challenged government action is "related" to immigration.

Second, the Government argues that § 1326 has been revised by later Congresses several times since its enactment, and that those revisions dissipate the discriminatory purpose of the Congress that enacted the Immigration and Naturalization Act (INA) in

1952. But the revisions to § 1326 simply built on a statute enacted with a discriminatory purpose by expanding liability and increasing penalties. Broadening the statute's reach and increasing its punitiveness does not change the law's discriminatory origins.

Lastly, the Government argues that Mr. Bermudez-Ruiz has failed to show the necessary disparate impact under *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020), because a prohibition against illegal reentry naturally impacts Mexicans and Latinos more than others. But *Regents* merely recognized that such a natural disparity is *by itself* insufficient to carry a challenger's burden to show a discriminatory purpose. Mr. Bermudez-Ruiz's evidence of close to a 99% disparity, when combined with his evidence that Congress had a discriminatory purpose, is more than sufficient.

**I. Rational-basis review does not apply.**

Rational-basis review does not apply because Mr. Bermudez-Ruiz challenges § 1326's racially discriminatory purpose and effect. The Government makes two related arguments in support of rational-basis review, but neither is persuasive. First, the Government argues that all "immigration-related" laws receive rational-basis review, citing to cases that have used broad language to describe the deferential treatment courts give to challenges made in the immigration context, mostly

involving the admission or exclusion of aliens. (Doc. 44, pp. 5-8).[1] *See, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018). Then, the Government argues that classifications based on alienage receive rational basis review, as do classifications among types of aliens. (Doc. 44, pp. 8-9). In the Government's view, aliens who have been deported and then have returned are a "subset" of all aliens, and so the only distinction made by § 1326 is among groups of aliens. (Doc. 44, p. 9).

This argument misunderstands Mr. Bermudez-Ruiz's challenge to § 1326. Mr. Bermudez-Ruiz does not challenge the statute's distinction on alienage grounds, but on racial grounds. He has presented evidence that Congress enacted § 1326 with a motivating purpose of harming Mexicans and other Latinos. His evidence has shown that the "subset" of aliens selected by Congress was selected *because Congress knew it would harm Mexicans the most*. He has presented evidence that Congress enacted a prohibition against illegal reentry *because* it knew that Mexicans, in

---

[1] Most district courts have rejected similar arguments made by the Government in other equal-protection challenges to § 1326. *See United States v. Carillo-Lopez*, -- F. Supp. 3d --, 2021 WL 3667330, at *1-3 (D. Nev. Aug. 18, 2021) (rejecting the government's argument to apply deferential, rational-basis review as "not persuasive"); *United States v. Machic-Xiap*, -- F. Supp. 3d --, 2021 WL 3362738, at *9-10 (D. Ore. Aug. 3, 2021) (rejecting the government's argument to apply rational-basis review as "mistaken" and "without merit"); *United States v. Wence*, 2021 WL 2463567, at *2-4 (D. V.I. June 15, 2021) (rejecting the government's argument to apply rational-basis review); *United States v. Medina-Zepeda*, No. 2:20-cr-57-FMO, at 3 (C.D. Cal. Jan. 5, 2021) (ECF Doc. 43-1) (rejecting government's reliance on plenary power doctrine and applying *Arlington Heights*); *but see United States v. Novondo-Ceballos*, 2021 WL 3570229, at *3-4 (D. N.M. Aug. 12, 2021) (reviewing for rational basis after concluding that § 1326 is an immigration law).

particular, were more likely to have been deported, and so more likely to be subject to the law's penalties. (Doc. 30, Ex. A, pp. 6-7). Mr. Bermudez-Ruiz does not simply challenge a distinction made by the statute, he challenges Congress's racial motivation for enacting the statute.

The framework for a racial animus challenge such as this one is supplied not by the Court's rational-basis cases, but by *Arlington Heights* – even in "immigration-related" cases. *See Regents*, 140 S. Ct. at 1915. In *Regents*, the Court considered the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals program, which allowed certain unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal. *Id*. at 1901.

A variety of plaintiffs sued, raising several claims, including a claim that the recission infringed the equal-protection guarantee of the Fifth Amendment. *Id*. at 1903. Although the parties disputed the "proper framing" [2] of this claim, no party or justice advocated applying rational-basis review to the claim. *Id*. at 1915. Writing for a four-justice plurality, Chief Justice Roberts set out the standard to be applied to the case: "To plead animus, a plaintiff must raise a plausible inference that an

---

[2] The dispute arose because the government framed the claim as selective enforcement and argued it was barred by *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 488 (1999). *See Regents*, 140 S. Ct. at 1915. The Court avoided resolving the issue by assuming the claim was cognizable before finding the allegations insufficient under *Arlington Heights*. *Id.*

'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Id*. (quoting *Arlington Heights*, 429 U.S. at 266); *see also id*. at 1917-18 (Sotomayor, J., concurring in part, concurring in the judgment, and dissenting in part) (applying the *Arlington Heights* framework to the equal-protection claim). [3]

*Regents* demonstrates that it is the nature of the claim that determines the equal-protection framework. So long as the challenger attacks the government action as being racially *motivated*, the *Arlington Heights* framework applies, even if the government action at issue is "immigration related." *See Carrillo-Lopez*, 2021 WL 3667330, at *2 ("The federal government's plenary power over immigration does not give it license to enact racially discriminatory statutes in violation of equal protection"). Here, Mr. Bermudez-Ruiz alleges actual racial animus in the enactment of § 1326, not merely some unjustified distinction among groups of aliens. Accordingly, this Court should apply the *Arlington Heights* framework to his claim. [4]

---

[3] The remaining four justices concurred in the judgment on the equal protection claim. *Id*. at 1919 n.1 (Thomas, J., concurring in the judgment in part and dissenting in part, joined by Alito and Gorsuch, JJ.); *id*. at 1936 (Kavanaugh, J., concurring in the judgment and dissenting in part).

[4] To be sure, in *Trump v. Hawaii*, the Court suggested that rational-basis review should apply to most constitutional claims relating to immigration. *See* 138 S. Ct. at 2420 n.5. But just shy of two years later, the Court applied *Arlington Heights* in *Regents*. *Trump* and *Regents* can be squared in that (1) *Trump* involved a claim of religious discrimination, while *Regents* involved a claim of racial discrimination, and (2) the Court in *Trump* focused on national security concerns in selecting rational-basis review, while no such concerns were present in *Regents*. *See Trump*, 138 S. Ct. at 2419-20. In any event, *Regents* controls in this case to provide for review under *Arlington Heights*.

The criminal context of this case further supports application of the *Arlington Heights* framework rather than rational-basis review. *See Wence*, 2021 WL 2463567, at *3 ("The fact that Wence challenges a criminal law, rather than an executive policy setting immigration privileges and priorities, further buttresses the premise that his equal protection challenge is reviewable under more than the highly deferential rational basis standard offered by the Government"). The highly deferential treatment often given to the government's decisions in the immigration realm is justified by Congress and the President's plenary power over the admission and naturalization of immigrants. *See Trump*, 138 S. Ct. at 2419. But "the courts have also recognized that aliens can raise constitutional challenges to deprivations of liberty or property outside the context of entry or admission, when the plenary authority of the political branches is not implicated." *Jean v. Nelson*, 727 F.3d 957, 972 (11th Cir. 1984) (en banc). One such context is criminal prosecution:

> When the government subjects an alien to the criminal process it is plainly no longer seeking to effectuate its power to control admission into the United States by removing the alien from this country. The arrests of the aliens in *Wong Wing*[ *v. United States*, 163 U.S. 228 (1896)] and [*United States v. Henry*, 605 F.2d 908 (5th Cir. 1979)] may have grown out of the Executive's efforts to control the entry of foreigners into the United States, but the decision by government officials to subject them to criminal prosecution or punishment, rather than deportation, completely changed the nature of the proceedings. From that point forward any action taken by the government derived not from its power to control admission into this country, but from the powers of the Executive over law enforcement. The government's actions in prosecuting Henry and imprisoning Wong Wing therefore fell

6

>outside the plenary power to control immigration that justifies the extraordinary executive and congressional latitude in that area.

*Id.* at 973 (footnote omitted).

Here, the Government does not seek to deport or deny admission to Mr. Bermudez-Ruiz, it seeks to punish him criminally. Under *Jean*, the concerns that might normally justify rational-basis review are absent. This Court should review Mr. Bermudez-Ruiz's racial animus claim as it would any other, under *Arlington Heights*.

Lastly and relatedly, the Government argues that § 1326's text makes no distinction based on race. (Doc. 44, p. 9). True enough, but the Government misses the mark. This would be a much easier case to decide if § 1326 *expressly* discriminated on the basis of race. But *every* government action reviewed under *Arlington Heights* is race-neutral on its face. The zoning decision in *Arlington Heights* was facially neutral; the disenfranchisement provision in *Hunter v. Underwood*, 471 U.S. 222 (1985), was facially neutral; the electoral map re-districting in *Abbot v. Perez*, 138 S. Ct. 2305 (2018), was facially neutral, and so on. But in each case, the Court reviewed for a racially discriminatory purpose and effect. This Court should do the same, even though § 1326 is racially neutral on its face.[5]

---

[5] The Government writes, "Bermudez-Ruiz fails to cite any case in the Supreme Court or the

## II. Congress's revisions to § 1326 are irrelevant.

The Government does not seriously contest Mr. Bermudez-Ruiz's evidence that the original enactment of the federal crime of illegal reentry was the product of anti-Mexican racism. (*See* Doc. 44, p. 17) ("So, even if we accept the worst about the original Congress that enacted the 1929 legislation, section 1326 would still not violate principles of equal protection"). The Government retreats, puzzlingly, to arguing that (1) Mr. Bermudez-Ruiz has placed too much focus on the 1929 law, rather than the 1952 law, but also that (2) we know that the 1929 Congress would have enacted the 1929 law even without its invidious purpose because the 1952 Congress enacted § 1326 more than two decades later. (*Id.*). To be absolutely clear: Mr. Bermudez-Ruiz challenges the 1952 enactment of § 1326, the statute under which he is indicted. This Court must decide whether that statute was enacted with racial animus as a motivating purpose, considering, among other factors, the history

---

Eleventh Circuit applying the rubric of *Arlington Heights* to immigration laws passed by Congress." (Doc. 44, pp. 12-13). This carefully narrowed sentence could have a misleading effect. True, the recission at issue in *Regents* was effected by the Executive, not Congress. But the Government does not even attempt to explain why racial animus claims should be analyzed differently when it is Congress doing the discriminating. *Regents* controls here. Further, while not Supreme Court or Eleventh Circuit cases, Mr. Bermudez-Ruiz cites three district court cases that comprehensively considered the issue and applied *Arlington Heights* to § 1326. *See Carrillo-Lopez*, 2021 WL 3667330, at *2; *Machic-Xiap*, __ F. Supp. 3d at __, 2021 WL 3362738, at *3 n.3; *Wence*, 2021 WL 2463567, at *2-4. The issue has simply not reached the Supreme Court or the Eleventh Circuit.

of the law of illegal reentry in the United States before its enactment, including the 1929 act and its purposes. (*See* Doc. 30, pp. 23-24).

Given this framing, the Government's arguments regarding Congress's *later* amendments to the 1952 act are meritless. It is the 1952 act that is before this Court. As the Government accurately explains, subsequent Congresses in the 1990's amended § 1326 to (1) increase penalties, (2) expand liability, and (3) limit collateral attacks. (Doc. 44, p. 5). That is, later Congresses have made the 1952 act more punitive. What the Government does not adequately explain is what this says about *the 1952 act*. The amendments in the 1990's say nothing about the motives of the Congress that enacted § 1326 in 1952. Assuming the INA was enacted with a discriminatory purpose, as Mr. Bermudez-Ruiz argues, later Congresses' ratcheting up its punitive effect does not make the problem better, but worse. The Congresses of the 1990's did not repeal an unconstitutional act, and then reenact it, now clear of mind and spirit. Rather, Congress *amended* an existing statute, originally passed with discriminatory intent, to make it more punitive.

*Hunter* demonstrates that a law enacted with discriminatory intent is not made immune from an equal-protection challenge by a few later changes. In *Hunter*, an Alabama constitutional convention at which "zeal for white supremacy ran rampant" enacted a provision disenfranchising anyone convicted a crime involving

9

moral turpitude, a provision that disenfranchised ten times as many blacks as whites. *Hunter*, 471 U.S. at 222, 227, 229-31.

> The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional. [The Supreme Court] rejected that argument because the amendments did not alter the intent with which the article, including the parts that remained, had been adopted.

*Abbott*, 138 S. Ct. at 2325 (discussing *Hunter*).

In suggesting that the 1990's amendments to § 1326 somehow absolved the statute of its original discriminatory purpose, the Government's argument is even weaker than Alabama's was in *Hunter*. The 1990's amendments did not "prune" away any of the provisions causing the discriminatory effect, as in *Hunter*. Rather, they exacerbated the problem. Whatever the effect of the 1990's amendments, as in *Hunter*, they "did not alter the intent with which [§ 1326] . . . had been adopted." *See Abbott*, 138 S. Ct. at 2325.

This is not to say, as the Government suggests, that Mr. Bermudez-Ruiz is arguing that "the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry." (Doc. 44, p. 15). As *Abbott* said of *Hunter*, "the Court specifically declined to address the question whether the then-existing version would have been valid if '[re]enacted today.'" *Id.* (quoting *Hunter*, 471 U.S. at 233). A future Congress could repeal § 1326, and then reenact a new statute criminalizing

10

illegal reentry without racial animus.  *See Machic-Xiap*, __ F. Supp. 3d at __, 2021 WL 3362738, at * 15 (suggesting that Congress could and probably should enact legislation disavowing earlier expressions of racism in its immigration laws).  But Congress has not done so, and its 1990's amendments did not have that effect.

### III.  Mr. Bermudez-Ruiz's evidence of disparate impact is sufficient.

The Government argues that Mr. Bermudez-Ruiz's evidence that up to 99% of those impacted by § 1326 are Mexicans or other Latinos is not "cognizable" because this result is "the product of geography, not discrimination." (Doc. 44, p. 26).  The Government relies primarily on a passage in *Regents*.  (*Id*. at 27).

The Government misunderstands the import of the disparate impact evidence at issue in *Regents*.  Evidence of disparate impact plays several roles in an *Arlington Heights* analysis.  First, at least in the Eleventh Circuit, a showing of disparate impact is a standalone condition precedent to the granting of any relief.  *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021).  The "purpose" and "effect" prongs are conjunctive.  *See id*.  And the standard for this threshold question of disparate impact only requires evidence that § 1326 "bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976); *Birmingham Ministries*, 992 F.3d at 1321; *Carrillo-Lopez*, 2021 WL 3667330, at *6; *Wence*, 2021 WL 2463567, at * 9.  "That an innocent explanation

11

may exist for the disparity does not eliminate that disparity." *Machic-Xiap*, 2021 WL 3362738, at *11.

Second, evidence of a disparate impact may constitute evidence of discriminatory *intent*. Evidence that an official action will have a disparate impact on a particular race is relevant evidence that the decision was motivated by racial animus and, when the impact is extreme, may even be sufficient evidence of racial animus by itself:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it bears more heavily on one race than another may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence.

*Arlington Heights*, 429 U.S. at 266 (cleaned up).

Relatedly, evidence of a past disparate impact may bear on a decision maker's intent by showing that a present disparate impact was known or foreseeable. *See Birmingham Ministries*, 992 F.3d at 1321-22 (listing "the foreseeability of the disparate impact" and "knowledge of that impact" as relevant factors). For example, here, Mr. Bermudez-Ruiz's evidence that the 1929 illegal reentry law had an

12

overwhelmingly disparate impact against Mexicans bears on whether the 1952 Congress knew that § 1326 would have a similar impact when it considered the INA. (Doc. 30, p. 17).

In *Regents*, the Court was concerned with disparate impact *as evidence of discriminatory intent*. The plurality opinion began by stating the basic legal test provided by *Arlington Heights*, and the evidence that could be used to meet that test:

> To plead animus, a plaintiff must raise a plausible inference that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. [*Arlington Heights*, 429 U.S. at 266]. *Possible evidence includes disparate impact on a particular group*, "[d]epartures from the normal procedural sequence," and "contemporary statements by members of the decisionmaking body." *Id.*, at 266-68.

*Regents*, 140 S. Ct. at 1916 (emphasis added). Having recounted the evidence offered by the plaintiffs, the plurality considered each factor:

> None of these points, *either singly or in concert*, establishes a plausible equal protection claim. First, because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds.

*Id*. at 1915-16 (citation omitted; emphasis added).

Thus, in *Regents*, the evidence of disparate impact was insufficient, by itself and along with the other evidence offered by the plaintiffs, to show the decision maker's intent. *See Wence*, 2021 WL 2463567, at *10 ("The plurality in *Regents*

13

merely restated the settled principle that disparate impact alone, absent other evidence of discriminatory motive, is insufficient to state claim under *Arlington Heights*"). But *Regents* did not hold, as the Government seems to suggest, that such evidence could never meet the disparate impact prong *even assuming discriminatory intent*. (*See* Doc. 29, p. 25 (arguing that Mr. Bermudez-Ruiz's statistical evidence is not "cognizable"); *id*. at 29 (arguing that "the Court should also reject Bermudez-Ruiz's attempt to demonstrate a cognizable disparate impact")).

      Justice Sotomayor's dissent confirms this understanding of *Regents*. Justice Sotomayor faulted the majority for considering the disparate impact evidence too much "in isolation." *Regents*, 140 S. Ct. at 1917 (Sotomayor, J., concurring in part, concurring in the judgment in part, and dissenting in part). Under her view, the Court should have considered this evidence along with evidence of the President's public statements, which the plurality had rejected. *Id*. at 1918. Thus, the dispute between the plurality and the dissent in *Regents* centered on just how to consider the disparate impact evidence along with the other evidence, not on whether the evidence was "cognizable" at all. Five justices agreed that the disparate impact evidence was to be considered in light of other evidence of discriminatory intent. The plurality and dissent disagreed as to what *other* evidence should be considered along with the disparate impact evidence, and whether the plaintiffs plausibly showed a discriminatory intent.

14

Here, Mr. Bermudez-Ruiz has offered evidence that close to 99% of people prosecuted under § 1326 are Hispanic. (*See* Exhibit O to Mr. Bermudez-Ruiz's motion to dismiss, providing U.S. Sentencing Commission data on the race of offenders sentenced under § 1326). The disparate impact could not be much higher. That could be attributable to an accident of geography, as the Government suggests. Or, it could be no accident at all, and instead the very result intended by Congress, as Mr. Bermudez-Ruiz argues. That is the question for the Court to decide. But Mr. Bermudez-Ruiz's evidence of a 99% disparity quite obviously demonstrates that § 1326 bears more heavily on one race than another, and therefore surpasses the threshold necessary to trigger an inquiry into Congress's intent. The disparate impact is "an important starting point," requiring the Court to move on to considering "whether invidious discriminatory purpose was a motivating factor," "a sensitive inquiry into such circumstantial and direct evidence of intent as may available." *See Arlington Heights*, 429 U.S. at 266. This Court should perform that inquiry.

                                        A. FITZGERALD HALL, ESQ
                                        FEDERAL DEFENDER

                                        */s **Samuel E. Landes***
                                        Samuel E. Landes, Esq,
                                        D.C. Bar No. 1552625
                                        400 North Tampa Street, Ste. 2700
                                        Tampa, Florida 33602
                                        Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th of October 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA William S. Hamilton.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender